**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **HENRY RAY CAMPBELL,** ) | |
| ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO. 5:18-CV-434 (MTT)** |
| ) | |
| **ADVANCED CORE CONCEPTS, LLC,** ) | |
| ) | |
| ) | |
| **Defendant.** ) | |
| _____ ) | |

### ORDER

Defendant Advanced Core Concepts, LLC ("ACC") has moved for summary judgment.  Doc. 19.  For the following reasons, that motion (Doc. 19) is **GRANTED**.

### I. BACKGROUND[1]

Two points merit note at the outset.  First, although Ray Campbell is proceeding *pro se*, he is an experienced litigator.  This is his second employment discrimination lawsuit against ACC.[2]  Campbell was previously employed by ACC from February 1 to February 27, 2012, before being terminated due to lack of funding.  Doc. 21 at 17:25−18:12; *Campbell v. Advance Core Consulting, Inc.*, 2016 WL 1241232, at *2 (M.D. Ga. March 28, 2016).  When funding became available in April 2012, ACC chose

---

[1] Unless otherwise stated, the facts are undisputed and are viewed in the light most favorable to the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

[2] Campbell takes issue with the fact that he sued ACC twice; he first sued Advanced Core Consulting, Inc. in 2014, and he now sues Advanced Core Concepts, LLC.  Docs. 24-1 at 2−3; 24-2 at 1, 7; 24-3 at ¶ 2; *see* Campbell v. Advance Core Consulting, Inc., No. 5:14-cv-195-CAR, Doc. 1.  Although ACC apparently changed its name and its corporate structure since his last suit, he made it clear in his deposition that it is the same company.  Doc. 21 at 8:1−21, 11:16−18, 11:24−12:2, 12:17−20, 18:4−12, 18:16−19, 20:11−13, 21:15−16.

not to rehire him due to a government customer's concerns.  *Id.* at *2−*3.  Specifically, ACC chose not to rehire Campbell because the United States Department of Defense ("DoD") AIMS[3] engineer/project manager at the time, Paul Washlesky, "expressed concerns about bringing [Campbell] back … due to communication issues."  *Id.* at *3.  A month before his termination, Campbell emailed Washlesky using a "tone" that Washlesky disliked.  *Id.*  A month after his termination, Campbell sent "an email to one of [ACC's] customers, stating that he had been 'terminated in favor of personnel with no experience.'"  *Id.* at *2.  "That same month, [Campbell] sent an email to [his immediate supervisor, April] Griner[,] calling her a 'glorified secretary.'"  *Id.*  Campbell then filed four charges with the Equal Employment Opportunity Commission and a complaint with the Office of Federal Contract Compliance Programs before filing suit against ACC in this Court in May 2014, alleging age and sex discrimination.  *Id.* at *3; Doc. 19-4 ¶ 6.  This Court, Judge Royal presiding, entered summary judgment against Campbell.  *Campbell*, 2016 WL 1241232, at *1; Doc. 21 at 12:25−13:1.

Before filing this case, Campbell filed a defamation suit against Jerome Jones, about whom we will hear more; a defamation suit against the United States; various defamation suits against ACC; and a whistleblower complaint in which he also accused Jones of misconduct.  Docs. 21 at 31:15−32:24, 347; 24-3 at 61−64; Campbell v. Jones, No. 5:18-cv-457-CHW, Doc. 21.  He is clearly accustomed to court rules and procedures as evidenced by, if nothing else, his ability to build a voluminous record.  *See generally* Doc. 24-3.  Still, the Court views his pleadings generously.

---

[3] AIMS stands for Air Traffic Control Radar Beacon Systems; Identification Friend or Foe; Mark XII, XIIA, XIIB; Systems.  Doc. 19-4 ¶ 3.

Second, the characters and parties are many, and the Court makes extra effort to distinguish among them.  This is important because, overwhelmingly, Campbell's complaints are not directed at ACC, his employer, but rather at Jones, a government employee with whom Campbell worked.

## A. Background

ACC provides engineering and technical support, logistics, sustainment services, acquisition support, foreign military sales ("FMS")[4] support, and information technology solutions for government and commercial customers seeking AIMS certification, including the DoD, its biggest customer.  Doc. 19-4 ¶¶ 3, 4.  ACC also serves as a subcontractor for KBRwyle, a prime contractor for the DoD.  *Id.* ¶ 4; Doc. 21 at 93:20−25.

Campbell worked for ACC as a program manager for AIMS commercial projects—he was the lead for commercial projects—and FMS projects from July 2016 to December 2017.  Doc. 21 at 12:17−18, 13:20−14:9, 34:2−4, 65:15−21.  As a program manager, Campbell provided technical support for the DoD AIMS program office for both commercial and FMS projects, which sometimes required international travel.  *Id.* at 14:6−9, 14:19−15:8.  When not traveling, Campbell worked at the DoD AIMS office on Robins Air Force Base, primarily with Jani Le, a DoD engineer/program manager, who was responsible for the office's FMS projects.  *Id.* at 15:19−16:7, 26:2, 26:19, 27:12−15, 91:8−9.

---

[4] Foreign military sales are sales to foreign governments, not foreign commercial entities.  Doc. 21 at 26:7−11.

**B.  Travel Requests**

Campbell now alleges that his dispute with ACC began with the handling of his travel requests.  Travel had to be approved by April Griner, an ACC employee and Campbell's direct supervisor; a representative from the DoD AIMS office, a government employee; and Zach Hodges, an employee of KBRwyle.  *Id.* at 13:24−1, 26:20−27:4, 36:6−22, 38:9−13, 92:7−10, 93:20−25.  The first indication of Campbell's dissatisfaction was a June 4, 2017 email to ACC's Director of Human Resources, Trina Cohenour.  Docs. 19-4 at 17; 21 at 250.  Campbell told Cohenour he believed he was "being discriminated [against] by April Griner and Zach Hodges because of my age or in retaliation."[5]  Doc. 19-4 at 17.  However, in a June 1 draft of this email, Campbell wrote that he felt "like I am being discriminated [against] by April, Jerome [Jones, a DoD AIMS office employee,] and Zach."  Doc. 21 at 250.  Campbell testified in his deposition that he "took Jerome out" of the June 4 email because Jones was a government employee, Campbell "wasn't really working for Jerome," and all travel requests had to go through Griner and Hodges.  *Id.* at 45:20−46:12.  Yet earlier in his deposition he testified, "I think it was April Griner, Zach Hodges, and Jerome Jones [who were discriminating against me in the handling of my travel requests]."  *Id.* at 36:6−9.  In fact, the DoD AIMS office was the ultimate approval authority of travel requests.  *Id.* at 36:6−22; *see* Doc. 19-4 at 35 ("[International projects] are performed within a narrow band of authority and

---

[5] Campbell asserts, without providing any evidence other than his own testimony, that Griner was younger than him, and ACC has not objected to this assertion, nor has it provided any evidence otherwise.  *Id.* at 23:15−23.  For all the Court knows, Griner is one day younger than Campbell.  Similarly, Campbell asserts, without any explanation or detail, that Hodges is also younger than him.  *Id.* at 22:11−17.

permission from the DoD AIMS Program Office.  Without their approval on a case by case basis, there is no AIMS Commercial activity for ACC.").

But the June 4 email doesn't mention travel requests and provides no specific examples of age discrimination.  Campbell just claimed "it" started "with subtle and sometimes not so subtle remarks and actions that I am now beginning to consider harassment and intimidation because of my age or in retaliation."  Doc. 19-4 at 17.  He acknowledged that he could be "a little oversensitive" and that nothing had affected his job performance or had adversely affected his working relationship with either Griner or Hodges.  *Id.*  He suggested that perhaps "just a general reminder to them about discrimination is all that is needed."  *Id.*

The following week, Cohenour and ACC CEO Trase Travers met with Campbell, who had just returned from an approved trip to Budapest, to discuss his concerns.  *Id.* ¶ 12.  In that meeting, Campbell still could not say how he had been a victim of discrimination or retaliation.  *Id.*  He only expressed some frustration because travel requests had been denied by Griner and Hodges.  *Id.*  Travers discussed with Campbell the fact that management of travel requests was a joint responsibility, involving Griner, on behalf of ACC; Hodges, on behalf of KBRwyle; and Jerome Jones, a government employee, on behalf of the DoD AIMS office.  *Id.*  Travers promised Campbell that he would look into his concerns.  *Id.*  According to Travers, he concluded that travel requests were being managed properly.  *Id.* ¶ 13.  Travers considered the matter resolved.  *Id.*

Then, on July 18, Campbell changed tack.  Without any notice to ACC, Campbell emailed Jones' supervisor, DoD employee David Cannane, that he believed he was

"being discriminated against because of my age or in retaliation by *Jerome Jones*." *Id.* at 24; Doc. 21 at 262 (emphasis added). Campbell now claimed that Jones was denying a "majority" of Campbell's travel requests. Doc. 19-4 at 24. Campbell was sure ("99.9 per cent sure") that if the requests had Griner's or Hodges' name on them, they would have been approved. *Id.*; Doc. 21 at 23:4−6. In his deposition, Campbell said he thought his requests were denied due to his age because Hodges and Griner submitted travel requests that were never denied. Doc. 21 at 23:4−16, 38:2−8, 58:24−59:5. But when asked if he knew if any of their requests were denied, he responded, "I do not know. … I don't think they were. … I do not know [if all their requests to travel were granted]. … I think they were. … I never heard any comments that they wasn't approved." *Id.* at 22:11−23:23, 35:1−36:2. Whatever his complaint was, Campbell again acknowledged in his email that he perhaps was "over sensitive" and that perhaps Jones didn't realize what he was doing. Doc. 19-4 at 24. Campbell made it clear that he was not registering "a complaint at this point;" rather, his email was just "informational" and he wished to remain private. *Id.*

Cannane advised Campbell to speak with Jones directly about "how [he] feel[s]." Doc. 21 at 261. Campbell "had a healthy discussion" with Jones on July 26, leaving Campbell "feel[ing] comfortable with the situation." *Id.* at 260. He told Cannane that "no further action [was] necessary from [Cannane] at this time." *Id.*

## C. Email to Prenot-Guinard

In September, Campbell traveled to France for a commercial project. Doc. 24-3 at 7. While there, Francois Prenot-Guinard, a French employee of Airbus with whom Campbell was working on a *commercial* project, asked Campbell for advice on getting a

letter of recommendation through the DoD AIMS office for a *non-commercial* project. Doc. 21 at 80:14−24, 274−75, 277.  Campbell forwarded his email to Griner, and Griner told Campbell that Prenot-Guinard must go through John Finch,[6] who could submit the paperwork to the DoD AIMS office, and that ACC could not "accept request for recommendation letters … for anyone." *Id.* at 81:5−6, 273−75.  Campbell forwarded Griner's email to Prenot-Guinard, further stating, "I am sorry the *AIMS Program Office* cannot help [you] expedite the process." *Id.* at 273 (emphasis added).  Griner, who was copied on the email, immediately emailed Finch's contact information to Prenot-Guinard and assured him that once they received the paperwork from Finch, ACC would be happy to help him.  *Id.* at 276.

Jones found out about the email and was upset that Campbell represented the AIMS office without permission[7] and, particularly, that Campbell "discredited" the AIMS office by telling Prenot-Guinard that they could not "expedite the process."[8]  Doc. 24-3 at 50−51.  Jones voiced his concerns to Griner and Travers and stated that he "will not support any effort that [Campbell] is apart [sic] of." *Id.* at 74; Doc. 19-4 ¶ 16.  Travers then told Campbell to "limit [his] discussions with the French to those tasks outlined" and to not offer "any assistance that would be in the AIMS purview."  Doc. 19-4 at 29. Campbell responded, "[I]t seems reasonable to me that the AIMS customer would want

---

[6] The parties never explain who John Finch is.

[7] Jones states that Campbell failed to follow "draft procedures," but Campbell maintains that he never received "'draft procedures' (if they even existed) before I left, confirming what I have been saying all along:  The pre-approved guidance and procedures did not exist prior to my trip to France September 2017 and Griner did not even mention any draft procedures to me before I left."  Doc. 24-3 at 7. Regardless, the point is that Jones was concerned about what he thought was inappropriate conduct.

[8] Campbell "admit[s] that the one sentence taken by itself or out of context might not look good, but [he] was in no way attempting to represent the DoD AIMS [office]."  *Id.* at 7−8.

ACC employees to promote the AIMS Program and [office] in any capacity whether it be commercial or not. … While, my intentions were good, I just have to remember in the future to focus more on which hat I have on." *Id.*

### D. DoD Employee Jones Convenes Meeting to Discuss Campbell's "[W]ork-[R]elated [I]ntegrity and [P]erformance"

On October 3, DoD AIMS Office Chief Engineer John Seereiter and Jones met with Cohenour, Griner, Travers, and ACC Vice President Darren Bergan "to address Mr. Campbell's unauthorized performance of work under the DoD/KBRwyle contract while he was working on a separate contract for ACC—which was completely unrelated to the DoD/KBRwyle contract." Docs. 19-4 at 14; 24-3 at 50. "Other issues regarding Mr. Campbell's work-related integrity and performance were also discussed[,]" including his "inappropriate conduct in meetings with representatives of foreign governments where he acted and spoke outside of his responsibilities in support of AIMS." Doc. 19-4 at 11, 14. Jones maintained that "he no longer trusted Campbell to work on his projects, the Commercial efforts at the time, and asked that he not be assigned to any in the future."[9] *Id.* ¶ 17; Doc. 24-3 at 50−51.

### E. Letter of Warning

On October 31, Travers, Griner, and ACC Vice-President Bergan met with Campbell and gave him a letter of warning. Doc. 21 at 86:1−17, 278−79. The letter informed Campbell that he would only be supporting Le on her FMS projects "rather than splitting [his] time with the ACC AIMS Commercial efforts" due to Jones'

---

[9] Perhaps not incidentally, ACC originally chose not to rehire Campbell in April 2012 because the DoD AIMS engineer/project manager at the time, Paul Washlesky—who then held the same position as Jones held during Campbell's second employment stint—"expressed concerns about bringing [Campbell] back … due to communication issues." *Campbell v. Advance Core Consulting, Inc.*, 2016 WL 1241232, at *2−*3 (M.D. Ga. March 28, 2016); Doc. 21 at 138:12−17.

complaints regarding Campbell's "communications and lack of following pre-approved guidance and procedures" with Prenot-Guinard.[10]  *Id.* at 278.  The letter also requested that Campbell "no longer have direct communications with [Jones]" because Jones was so angry.  *Id.*  Campbell was not terminated or suspended as a result of the letter, and the letter did not affect his benefits.  *See id.*  However, because Jones no longer wanted to work with Campbell, the letter stated that Campbell would no longer be the ACC lead program manager for commercial projects at the AIMS office.  *Id.*

On November 12, Campbell emailed Cohenour that he was "completely stunned" by the "discriminatory (as defined by the EEOC)" letter of warning.  *Id.* at 280.  How the letter was "discriminatory (as defined by the EEOC)," Campbell didn't say; the email doesn't mention age or any other form of discrimination.  What is clear is that, at that point, Campbell claimed Jones was the one doing the discriminating.  He requested a "full retraction" or he would "have no choice but to file a complaint against ACC with the EEOC and a complaint against Jerome Jones" and others with the Equal Employment Opportunity Office.  *Id.*  Travers refused to retract the letter, telling Campbell that it was the result of Jones' complaint, not discrimination.  *Id.* at 281−82.  He further stated that Campbell's complaints to non-ACC employees regarding his travel requests "could demonstrate a level of insubordination to my earlier request to work issues first through

---

[10] Campbell contends that Jones did not make these complaints because (1) the United States Air Force does not have written records that Jones made these complaints, and (2) Jones denied Campbell's defamation allegations in another case.  Doc. 24-3 ¶ 32, at 58−64.  Campbell attached the Air Force's response to his Freedom of Information Act request that he made in a defamation case against Jones in Houston County Magistrate Court.  *Id.* at 60−64.  In fact, the Air Force simply stated that it did not have written records of Jones' complaints.  *Id.* at 58−59.  Notwithstanding Campbell's contrary representation, Jones reiterated his complaints in response to Campbell's defamation suit against him.  Doc. 19-4 at 14−15.  In any event, and notwithstanding the considerable substantiation of the merit of Jones' dissatisfaction with Campbell, the relevant points are that Jones complained about Campbell—complaints which, on their face, had nothing to do with Campbell's age; Jones refused to work with Campbell; and ACC issued its letter of warning.

ACC.  It also does not produce an environment of trust and partnership with our customers."  *Id.* at 282.

## F.  Le's Departure

On December 4, Jones announced that DoD employee Le was leaving and that he would take over all FMS and commercial projects with the support of Griner and Hodges.[11]  *Id.* at 283.  Internally, this presented a dilemma for ACC.  Doc. 19-3 ¶ 13, at 18.  Because of Jones' complaints about Campbell,[12] ACC contemplated that Campbell would work only with Le.  *Id.*  Thus, ACC might have no assignments for Campbell because "[w]ithout [the DoD AIMS office's] approval on a case by case basis, there is no AIMS Commercial activity for ACC."  *Id.*  However, ACC took no action regarding Campbell.

## G.  The Events of December 11 and Campbell's Termination

Monday, December 11, 2017 was a busy day for Campbell.  First, at 6:59 a.m., he sent a lengthy email to Jones' superior, DoD employee David Cannane.  Doc. 21 at

---

[11] Campbell forwarded that email to his personal email.  Doc. 21 at 283.  In that same email chain, Campbell drafted another email from his personal email address to his work email address on December 7 stating, in its entirety:

> Ray has done an excellent job supporting these projects, why are you taking him off the projects?  It makes no sense!
>
> PS:  Neither am I aware or believe that Ray has violated any guidelines or procedures.
>
> To:  Jerome and john
> Cc:  all others on the e-mail
> BC:  me, agnew and darren.bergan@advancedcoreconcepts.com

*Id.*  When questioned about the email, Campbell stated that "I don't remember that email" and that he did not recall typing an email that he wanted someone else to send on his behalf.  *Id.* at 114:7−20.

[12] Campbell insists that Jones himself never denied Campbell work and cites Jones' December 11 email to Griner stating that Campbell "has not be[en] denied any travel or work on [Jones'] part."  Doc. 24-3 ¶ 29, at 32.  The email further requests that Campbell "not [be] associated with DoD AIMS in any capacity" due to Campbell's complaints of discrimination against Jones.  *Id.* at 32.

293−94.  He did not send a copy of this email to anyone at ACC.  Rather, he copied two

high-level DoD employees, including Cannane's superior.  *Id.* at 123:8−124:8.

Campbell began by saying that he had had a "private discussion" with Jones on July 26

about Campbell's "perception of his discrimination against me because of my age."  *Id.*

at 293.  Although Campbell thought the meeting went well, he now thought Jones was

"out to destroy my career with continued age discrimination plus sex and retaliation

discrimination."  *Id.*  He claimed that ACC's letter of warning was "evidence of Jerome

Jones aggressive pursuit of retaliation [and] is also evidence of his age and sex

discrimination."  *Id.*  He claimed that Jones "is a threat to my safety in the workplace."

*Id.* at 294.  Indeed, Campbell continued, Jones' "apparent uncontrollable violent

outburst of temper could also be a potential threat to anyone else in the workplace

area."  *Id.*  Further, he alleged, with no details, that Jones "has violated many ethical

rules related to contractors in the workplace in what I perceive as his aggressive pursuit

of age, sex and retaliation discrimination against me."  *Id.*  Referring to Le's departure,

he claimed that Jones' assumption of Le's projects was Jones' attempt to "further

discriminately [sic], harass, humiliate, intimidate me and insult me.  Before [Le] is even

out the door[,] he is taking the projects that I supported away from me."  *Id.*

    At 8:04 a.m., Campbell emailed Cohenour that he had "filed a charge of

discrimination with EEOC.  I am open to any offers to resolve this issue.  …"[13]  Doc. 19-

4 at 43.  This email made no mention of the email Campbell had just sent to Cannane.

*See generally id.*

---

[13] Campbell's email did not attach the "charge."  Doc. 21 at 284.  Actually, Campbell had filed an intake
questionnaire, which the EEOC received on December 10, 2017.  *Id.* at 244−49.  He did not file his EEOC
charge until February 20, 2018.  *Id.* at 243.

At 10:05 a.m., Campbell again emailed Cohenour, without any mention of his email to Cannane attacking Jones.  In that email, Campbell wrote that

> Jones is a threat to my safety in the workplace where we are both located in a small building.  I have been told to avoid him, avoid eye contact and have no form of communication with him.  It is impossible to avoid contact in that environment and now I am concerned that Jerome Jones could explode at any time against me.  I have been in the workplace environment with Jerome Jones present two days since 31 Oct letter of warning, 30 Nov and 1 Dec and I was nervous wreck those two days.

*Id.*  He asked to work from home "until this matter is resolved."  *Id.*  Travers emailed Campbell denying his request to work from home and stated that ACC's direction to avoid Jones "was presented on a basis of professional displeasure he exhibited as a result of your actions" and that Jones presented no "physical threat or violent intent."[14] Doc. 21 at 290.  In fact, there is no evidence of Jones' "violence," and Campbell admitted in his deposition that he had never witnessed Jones acting violently.  *Id.* at 129:3−18.

The following morning, Cannane forwarded Campbell's email accusing Jones of misconduct to various DoD officials and copied Griner.  *Id.* at 292.  According to the record, this was the first notice to ACC of Campbell's complaints to DoD officials. Cannane's only comment was that "[t]he Jerome Jones he describes is not the Jerome Jones I know.  I couldn't even finish reading it.  Ugh!"  *Id.*

On December 13, ACC terminated Campbell.  *Id.* at 297−98.  The termination letter noted that Campbell was being "dismissed for cause, specifically, exhibiting a pattern of insubordinate behavior in direct contravention to the wishes of your employer,

---

[14] Travers also told Campbell that Jones was out of the country at the time.  *Id.* at 290.

to include without limitation failing to heed and comply with the directions provided to you in an October 31, 2017 letter of warning." *Id.*  In particular, the letter noted Campbell's failure to direct his workplace complaints to ACC, rather than Cannane.  *Id.*

## II.  STANDARD

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim.'"  *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991) (emphasis in original) (quoting *Celotex Corp. v. Cartrett*, 477 U.S. 317, 323 (1986)).  The moving party "simply may show … that there is an absence of evidence to support the nonmoving party's case."  *Id.* at 1438 (quotation marks and citation omitted).  "Assuming the moving party has met its burden, the non-movant must then show a genuine dispute regarding any issue for which it will bear the burden of proof at trial."  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224−25 (11th Cir. 2002) (citing *Celotex Corp.*, 477 U.S. at 324).

In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).  A material fact is any fact relevant or necessary to the outcome of the suit, and a factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248.

### III.  DISCUSSION

In Campbell's February 20, 2018 EEOC charge, he alleged two adverse employment actions—the October 31, 2017 letter of warning and his December 13, 2017 termination.  Doc. 21 at 243.  Consistent with this, he stated in his charge that the discrimination took place between October 31 and December 13, 2017.  *Id.*  He claimed ACC's discrimination was based on sex, age, and retaliation.  *Id.*  In his complaint in this action, he asserted only an Age Discrimination in Employment Act retaliation claim.  Doc. 1.  Consistent with his EEOC charge, he alleged only two adverse actions—the letter of warning and his termination.  *Id.*  In its motion for summary judgment, ACC addresses, in addition to the two retaliation claims asserted by Campbell, various other claims that ACC apparently thought he might try to raise.  Doc. 19-1.  But in his brief in response to ACC's motion for summary judgment, Campbell, consistent with his EEOC charge and his complaint, addresses only his retaliation claims arising from the letter of warning and his termination.  Doc. 24-1.  Thus, it is only necessary to address the two claims Campbell actually asserts, although the Court will address briefly the claims not raised.

### A.  Retaliation Claims

The ADEA prohibits an employer from discriminating against an employee based on the employee's opposition to "any practice made unlawful" by the ADEA or because the employee has "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation" under the ADEA.  29 U.S.C. § 623(d).  These provisions are commonly referred to as the opposition and participation clauses.  *See E.E.O.C. v. Total Sys. Servs., Inc.*, 221 F.3d 1171, 1174 n.3 (11th Cir. 2000) (citations

omitted).  ADEA retaliation claims based on circumstantial evidence,[15] like Campbell's, are analyzed using the *McDonnell Douglas* burden-shifting framework.  *See Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1267 n.6 (11th Cir. 2001) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)).  To establish a *prima facie* case of retaliation under *McDonnell Douglas*, Campbell must first show that (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) the adverse action was causally related to the protected activity.  *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1135 (11th Cir. 2020) (citations omitted).

If Campbell establishes a *prima facie* case, then ACC must articulate a legitimate, non-retaliatory reason for its action.  *Sullivan v. Nat'l R.R. Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir. 1999).  Campbell must then show that the employer's proffered reasons were a pretext for the retaliatory conduct.  *Id.*  Campbell may prove pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  However, if the proffered reason is one that might have motivated a reasonable employer, Campbell "must meet that reason head on and rebut it, and [he] cannot succeed by simply quarreling with the wisdom of that reason."  *Chapman v. AI Transport*, 229 F.3d 1012, 1030 (11th Cir. 2000).  If a defendant articulates more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive summary judgment.  *Id.* at 1037.

---

[15] "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee."  *Caban-Wheeler v. Elsea*, 904 F.2d 1549, 1555 (11th Cir. 1990).  Campbell has provided no such evidence.

ACC argues that Campbell cannot establish that he engaged in protected activity and that, even if he could, he cannot show causation.[16]  Doc. 19-1 at 11−17.

### 1. Protected Activity

Because the alleged protected activities giving rise to Campbell's two retaliation claims overlap, the Court addresses these activities together.

Whether Campbell engaged in protected activity raises two issues—whether there was a basis for his belief that ACC had engaged in age discrimination, and whether the manner in which he opposed ACC's perceived discrimination was protected.  To establish that he engaged in statutorily protected activity, Campbell must show that he "had a *good faith, reasonable belief* that [ACC] was engaged in unlawful employment practices."  *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (quotation marks and citation omitted) (emphasis added).  In other words, Campbell "must not only show that he *subjectively* (that is, in good faith) believed that his employer was engaged in unlawful employment practices, but also that his belief was *objectively* reasonable in light of the facts and record presented."  *Little v. United Techs., Carrier Transicold Div.*, 103 F.3d 956, 960 (11th Cir. 1997) (emphasis in original).  To satisfy the subjective component, Campbell must show that his belief "was honest and *bona fide.*"  *Id.*  To satisfy the objective component, Campbell must show that an employee would have reasonably thought the employer's actions were unlawful—whether they were actually unlawful or not—in light of the circumstances.  *Id.*

Campbell alleges that the discrimination he complained of in his June meeting with Travers and Cohenour resulted in ACC's retaliatory letter of warning.  Doc. 24-1 at

---

[16] ACC also argues that the letter of warning was not an adverse employment action.  Doc. 19-1 at 8−9. That is a close call, and the Court assumes, without deciding, that it was an adverse employment action.

10.  He also alleges that the discrimination he complained of in his December 11 emails to Cohenour and Cannane and his EEOC intake questionnaire resulted in his retaliatory termination.  *Id.*  ACC argues that Campbell has shown neither a good faith nor an objectively reasonable belief that ACC had discriminated against him at the time he made those complaints.[17]  Doc. 19-1 at 11−15.

### a.  The Letter of Warning

Campbell claims that his June 14, 2017 meeting with Travers, which followed his June 4, 2017 email, was protected activity.  Doc. 24-1 at 10.  As Campbell puts it in his brief, the "meeting was to discuss Plaintiff's *perception* that he was being discriminated against and *the only reasonable explanation* was his age."  *Id.* at 15−16 (emphasis added).  His brief, however, makes no effort to establish that his "perception" of age discrimination was founded in good faith or was objectively reasonable.  He simply claims in conclusory fashion that travel requests were denied because of his age.  Yet in his deposition he admitted that he has no knowledge that younger program managers' requests were denied.  Docs. 21 at 35:17−36:2 ("I do not know [if any of Griner's or Hodges' travel requests were denied].  …  I do not know [if all of their travel

---

[17] ACC argues that Campbell cannot establish that he engaged in protected activity because the following complaints were unreasonable:  (1) Campbell's complaint to Travers about his travel request denials in June; (2) Campbell's complaint to Cannane about his travel request denials in June; (3) Campbell's demand that ACC retract the letter in November; and (4) Campbell's complaint to Cannane about Jones in December.  *Id.* at 13.  In his response, Campbell clarifies that he is alleging his June 14 meeting with Travers and Cohenour, his December 10 EEOC "complaint," and his December 11 email to Cannane constituted protected activity.  Doc. 24 at 15.  In its reply, ACC does not dispute that Campbell's EEOC intake questionnaire is protected activity *if* he could show that it was filed in good faith and was objectively reasonable, but contends that the other two complaints are not protected activity, even if he could show that they were made in good faith.  *See generally* Doc. 25.  *See also Marria v. C.R. England, Inc.*, 679 Fed. App'x 844, 849 (11th Cir. 2017) (holding that an EEOC intake questionnaire is considered protected activity).

requests were granted].  …  I never heard any comments that they wasn't approved."),[18]
39:12−16.  Moreover, his contemporaneous statements belie any suggestion that he
had specific facts supporting his "perception" of age discrimination.  His June 4 email,
which says nothing about travel requests, stated that "it" started "with subtle and
sometimes not so subtle remarks and actions that I am now beginning to consider
harassment and intimidation because of my age or in retaliation."  Doc. 19-4 at 17.  In
short, Campbell's "perception" of age discrimination is based on nothing more than
conjecture—he cites not a single fact to support his perception.  While he may believe
his perception is correct, that belief is not sufficient to constitute the good faith
necessary to establish protected activity.  And most certainly, a perception without facts
is not sufficient to satisfy the objective component of protected activity.

Because the evidence establishes that Campbell did not have a good faith,
reasonable belief that ACC had engaged in age discrimination when he met with
Travers and Cohenour in June 2017, he has not established that he engaged in
protected activity at that meeting.

### b.  Termination

Campbell claims ACC terminated him in retaliation for four incidents of protected
activity:  (1) his "appeal" of the letter of warning; (2) the December 10, 2017 filing of his
EEOC questionnaire; (3) his December 11 emails to Cohenour informing her he had

---

[18] Campbell contradicted his deposition statement in his self-serving affidavit, and it will not be
considered.  Doc. 24-3 at 2 ("[M]y associate contractor program managers travel requests were always
approved.");  *Van T. Junkins & Assocs. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir. 1984) (holding
that a party may not "create such an issue [of fact] with an affidavit that merely contradicts, without
explanation, previously given clear testimony").

filed a "complaint"[19] and that he could no longer work with Jones; and (4) his December 11 email to DoD officials complaining about Jones.  Doc. 24-1.  Once again, however, he makes no effort to demonstrate that his alleged protected activities were based on a good faith, reasonable belief that ACC had engaged in age discrimination.  Given the undisputed facts, he could not have made that showing had he tried.

With regard to the appeal of the letter of warning, Campbell argues that he "*considered* [it] as retaliation for the 14 June 2017 protected activity and age discrimination because it falsely charged him with misconduct that other substantially younger similarly situated employees were committing."  *Id.* at 15 (emphasis added).  Thus, he apparently claims the letter of warning, for that reason, was age discrimination, and his appeal was thus protected activity.  *Id.*  As discussed, Campbell does not have a basis for a good faith, reasonable belief that ACC discriminated in the approval of travel vouchers, which was the subject of the June 14 meeting.  As for his contention that the letter of warning falsely charged him with misconduct younger employees were also committing, Campbell cites no facts.  The Court assumes he refers to his complaint that ACC issued a letter of warning to him, but not to Griner, for emailing Prenot-Guinard.  However, it is undisputed that Jones was upset with the language Campbell used in his email, particularly his statement that "I am sorry the *AIMS Program Office* cannot help [you] expedite the process."  Doc. 21 at 273 (emphasis added).  Even Campbell "admit[s] that the one sentence taken by itself or out of context might not look good."  Doc. 24-3 at 7−8.  Griner's email to Prenot-Guinard, on the other hand, was

---

[19] The filing of an EEOC intake questionnaire is protected by the participation clause.  29 U.S.C. § 623(d); *see Marria*, 679 Fed. App'x at 849.  The question, however, is whether Campbell had a basis for the matters he raised in the questionnaire.

clearly an effort to repair the perceived damage done by Campbell's email.  *See* Doc. 21 at 276.  She offered Prenot-Guinard ACC's assistance once he completed the preliminary steps with John Finch.  *Id.*  Clearly, her conduct was not at all similar to Campbell's conduct, and thus the fact that she didn't get a letter of warning provides not even a suggestion of age discrimination.  There is simply no evidence that would provide Campbell a good faith, reasonable basis to believe that the letter of warning was rooted in age discrimination.  Certainly, on the undisputed facts, there was no objective basis to support such a belief.

With regard to Campbell's barrage of emails on December 11—accusing Jones of misconduct and informing Cohenour that he had filed an EEOC "complaint" and that he no longer wanted to work with Jones because he was a threat to his safety— Campbell offers no new facts suggesting that he had a good faith and reasonably held belief that his myriad, but very general, complaints arose from age discrimination.  To the extent that he raised new complaints, those complaints focused on Jones' alleged misconduct and Campbell's completely unsubstantiated claim that Jones posed a threat to his physical safety.  Even assuming Jones disliked Campbell, there is no evidence that Jones' actions were motivated by age bias.

As for Campbell's EEOC intake questionnaire that he filed on December 10, the substance of the filing was merely a recitation of his allegations for which, as previously discussed, he had no good faith, reasonable belief that the alleged conduct was discriminatory.  *Id.* at 244−49.  As stated by ACC in its reply brief, "[w]hile Plaintiff's action in going to the EEOC may be protected[,] … Plaintiff does not suddenly become insulated from his bad faith conduct just because he goes to the EEOC."  Doc. 27 at 8.

The allegations in the EEOC filing must be based on a good faith, reasonable belief to be considered protected activity; they were not.

In sum, Campbell cannot demonstrate, and has made no effort to demonstrate, that his claimed protected activities arose from a reasonably held, good faith belief that ACC had engaged in age discrimination.

Even if Campbell had an appropriate foundation for his "perception" that ACC had engaged in age discrimination, the manner in which he chose to oppose that perceived discrimination was not reasonable.  This is for two reasons:  Campbell's opposition to perceived discrimination rendered him ineffective in the position he held, and his manner of opposition unreasonably disrupted others in the workplace.

In *Gogel v. Kia Motors Manufacturing of Georgia, Inc.*, 967 F.3d 1121 (11th Cir. 2020), the Eleventh Circuit, sitting *en banc*, reviewed in depth its precedent addressing when an employee's manner of opposing discriminatory practices can render his activity unprotected.  Generally, oppositional conduct must be reasonable, and to determine whether conduct is reasonable a court must "'balanc[e] the purpose of the statute and the need to protect individuals asserting their rights thereunder against an employer's legitimate demands for loyalty, cooperation and a generally productive work environment.'"  *Gogel*, 967 F.3d at 1141 (quoting *Rollins v. Fla. Dep't of Law Enf't*, 868 F.2d 397, 401 (11th Cir. 1989)).  "[W]hen the means by which an employee expresses her opposition so interferes with the performance of her job duties that it renders [her] ineffective in the position for which [she] was employed, this oppositional conduct is not protected under Title VII's opposition clause."  *Id.* at 1139 (quotation marks and citation omitted).  In *Gogel*, the plaintiff, an employee relations manager who oversaw

discrimination investigations at Kia, recruited employees to sue Kia, or so Kia thought. *Id.* That conduct "rendered her ineffective in that position and reasonably prompted Kia to conclude that it could no longer trust her to do the job for which she was being paid." *Id. See also Jones v. Flagship Int'l*, 793 F.2d 714, 728 (5th Cir. 1986) (holding that an employer's in-house counsel's recruitment of coworkers to sue her employer was not protected activity because it conflicted with her job responsibilities) (relied upon in *Gogel*, 967 F.3d at 1140); *Hamm v. Members of the Bd. of Regents of the State of Fla.*, 708 F.2d 647, 654 (11th Cir. 1983) (holding that a human resources advisor acting as an advocate for aggrieved employees alleging discrimination against the employer is not protected activity); *Whatley v. Metro. Atlanta Rapid Transit Auth.*, 632 F.2d 1325, 1329 (5th Cir. 1980) (holding that an employer's EEOC compliance officer's filing of a discrimination complaint on behalf of another employee is not protected activity). [20]

Although an employee's manner of opposition may not render him ineffective in his job, his opposition is still unreasonable if he expresses his opposition "in a manner that unreasonably disrupts other employees or the workplace in general." *Gogel*, 967 F.3d at 1141 (citing *Rollins*, 868 F.2d 397). *Rollins v. Florida Department of Law Enforcement*, 868 F.2d 397 (11th Cir. 1989), is particularly instructive. There, the plaintiff "habitually bypassed the chain of command by bringing her complaints of discriminatory employment practices directly to the Commissioner of the [Florida Department of Law Enforcement], and on one occasion to the Governor of Florida, rather than to her unit supervisor, assistant supervisor, bureau chief, deputy director, or director." *Rollins*, 868 F.2d at 399. When the plaintiff was not bypassing the chain of

---

[20] The Eleventh Circuit has adopted as binding precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

command, she often complained to her supervisor, who testified that her "constant complaining and unsupported allegations had a damaging effect on morale within his unit." *Id.* The Eleventh Circuit held that this unreasonable disruption of the workplace was not protected activity. *Id.* at 401.

Here, the manner in which Campbell chose to voice his grievances both rendered him ineffective in his job and disrupted the workplace. Not only did he go outside the chain of command, he bypassed ACC entirely, taking his complaints to ACC's customer. First in June, with no notice to ACC, he contacted Jones' superior to complain about Jones' alleged misconduct. Docs. 19-4 at 17; 21 at 250. After receiving the letter of warning, Campbell "became uncooperative and argumentative" and threatened multiple lawsuits. Doc. 19-4 ¶ 19. And far from heeding the letter of warning, he doubled down by sending Cannane and other DoD officials an *ex parte* email leveling inflammatory charges against Jones. Doc. 21 at 123:8−125:15, 293. Given Campbell's conduct, it is not surprising that ACC's management had "never had an employee act this recklessly and disruptive in terms of customer relations or repeatedly complain about the same thing even though the issue had been thoroughly investigated." Doc. 19-4 ¶ 24. Nor is it surprising that Campbell's repeated attacks on Jones led the DoD AIMS program office to conclude that they could no longer work with Campbell, seriously disrupting ACC's relationship with its prime customer. *Id.* ¶ 17; Doc. 24-3 at 50−51.

In short, the manner in which Campbell chose to oppose perceived discrimination rendered him ineffective in his job duties because the AIMS program office no longer had confidence in him and Jones refused to work with him. Moreover, Campbell's

opposition unreasonably disrupted employee relations and the workplace in general. For these separate reasons, his opposition to perceived age discrimination was not reasonable and thus was not protected.

## 2. Causation

To establish a causal connection, Campbell must demonstrate that his "protected activity was a but-for cause of the alleged adverse action by the employer." *Gogel*, 967 F.3d at 1135 (quotation marks and citation omitted). "A plaintiff satisfies this element if he provides sufficient evidence of knowledge of the protected expression and that there was a close temporal proximity between this awareness and the adverse … action." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (quotation marks and citation omitted). However, "mere temporal proximity between … knowledge of protected activity and an adverse … action … must be very close." *Id.* (citing with approval cases where a three- to four-month gap was found to be insufficient to show causal connection) (quotation marks and citations omitted).

It is undisputed that ACC had knowledge of Campbell's June and December complaints. But Campbell's only effort to show that the letter of warning and termination are not wholly unrelated to his complaints is through temporal proximity. Doc. 24-1 at 13. Because more than four months passed between his June 14 meeting and the October 31 letter of warning, he cannot establish temporal proximity sufficient to infer that the June meeting was the cause of the letter of warning. Lacking temporal proximity, there is no evidence suggesting that the letter of warning was in retaliation for the June meeting. Campbell's speculation that the letter was retaliatory is just that: speculation with no basis in fact. Although temporal proximity clearly exists between

Campbell's December 11 emails and his December 13 termination (assuming he could establish that the emails were protected activity, which he cannot), ACC, as discussed next, has established  legitimate, nondiscriminatory reasons for his termination.

### 3.  Legitimate, Nondiscriminatory Reasons and Pretext

Even if Campbell could establish *prima facie* cases of retaliation, ACC had legitimate, non-discriminatory reasons for its letter of warning and for Campbell's termination.  ACC has provided evidence that (1) the letter "was a direct result of [Campbell's] misconduct in his communication towards [Prenot-Guinard] and the resulting customer complaint [by Jones]," and that (2) his termination "was a direct result of the repeated harassing and spurious complaints, including the final act of insubordination in contacting the customer's superiors with an unintelligible rambling email continuing the same unbelievable complaints, all resulting in a strained customer relationship for ACC."  Doc. 19-1 at 17.  ACC also notes that Campbell's termination "was imminent regardless" because Campbell's conduct had led to Jones' request "that [Campbell] be taken off all [his] projects" in combination with Le's departure and Jones taking over her projects.  *Id.* at 17 n.7.  Thus, legitimate business interests warranted the letter of warning and Campbell's termination.

As ACC notes in its reply, Campbell has not attempted to show pretext.  Doc. 27 at 4; *see generally* Doc. 24-1.  Nor can he; the undisputed facts, most of which Campbell himself documented, support ACC's decisions.  Thus, even if Campbell had been able to establish *prima facie* cases for his claims, he has not rebutted ACC's reasons for its actions.[21]

---

[21] The Court recognizes that successfully navigating *McDonnell Douglas* is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination [or retaliation] case."

In sum, ACC is entitled to summary judgment on Campbell's retaliation claims.

## B.  "Abandoned" (Actually Unasserted) Claims

As previously stated, ACC moves for summary judgment on various other claims that it thought Campbell might try to raise, but which Campbell does not address in his response.  Docs. 19-1; 24-1.  ACC argues Campbell's failure to respond renders those claims abandoned.  Doc. 27; *see generally* Doc. 24-1.  *See also Resolution Tr. Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment.  Rather, the onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citation omitted); *see Lowe v. Exel*, 2018 WL 2016277, at *6 n.16 (N.D. Ga. Apr. 27, 2018), *subsequently aff'd sub nom. Lowe v. Exel, Inc.*, 758 Fed. App'x 863 (11th Cir. 2019).  Even if they were not abandoned, these claims fail on the merits.

---

*Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011); *e.g.*, *Calvert v. Doe*, 648 Fed. App'x 925, 929 (11th Cir. 2016) (applying *Smith* to a retaliation case).  A plaintiff can always avoid summary judgment by creating a triable issue concerning the employer's discriminatory or retaliatory intent.  A plaintiff can do this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer discrimination [or retaliation] by the decisionmaker.'"  *Smith*, 644 F.3d at 1328 (quoting *Silverman v. Bd. of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)); *e.g.*, *Calvert*, 648 Fed. App'x at 929 (applying the convincing mosaic theory to a retaliation case).  However, for the reasons discussed throughout this order, Campbell has not presented "a convincing mosaic of circumstantial evidence" that ACC acted with discriminatory or retaliatory intent.  On the contrary, "[t]his is one of those rare cases where, [even if the plaintiff established] a *prima facie* case and [provided] sufficient evidence of pretext, no rational jury could conclude that the termination was discriminatory [or retaliatory]."  *See Motley v. Fulton Cty., Ga.*, 815 F.3d 733, 734 (11th Cir. 2016) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)) (other citations omitted).

### 1. Discrimination Claims

If Campbell had pursued discrimination claims, he could only base his claims on circumstantial evidence; there is clearly no direct evidence of age discrimination. To establish a *prima facie* case of age discrimination using circumstantial evidence, Campbell must show: "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position from which he was discharged; and (4) he was qualified to do the job from which he was discharged." *Liebman v. Metro. Life Ins. Co.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (citation omitted). If an employee has established a *prima facie* case, "the burden shifts to the employer to rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Id.* The burden then shifts back to the employee to show that the proffered reason is pretext. *Id.*

ACC contemplates that Campbell might claim that he was a victim of age discrimination because his travel requests were denied, because he was given a letter of warning, and because he was terminated. Doc. 19-1 at 7−11. ACC argues that the travel request denials and the letter of warning were not adverse actions, and that for all three possible claims, there were no younger, similarly situated employees who were treated better than him.[22] Doc. 19-1 at 8−11.

---

[22] ACC also argues that any discrimination claims, particularly those based on denied travel requests, are time-barred. *Id.* at 6. A plaintiff must "manifest[] [his] intent to activate the machinery of [the ADEA] by lodging [his] intake questionnaire with the EEOC" within 180 days of the alleged discriminatory conduct. *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1320 (11th Cir. 2001). Campbell did not file his intake questionnaire until December 10. Doc. 21 at 244−49. Thus, any alleged discriminatory conduct prior to June 13, 2017—180 days before his intake questionnaire was filed—is time-barred.

### a. Adverse Employment Action

ACC contends the travel request denials and the letter of warning were not adverse employment actions.  Doc. 19-1 at 8–9.  As previously stated, whether the letter of warning was an adverse employment action is a close call, but the Court assumes, without deciding, that it was.  But the travel request denials were clearly not adverse employment actions.

An adverse employment action must be tangible, meaning it must constitute "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."  *Anderson v. Savage Laboratories, Inc.*, 675 F.2d 1221, 1224–25 (11th Cir. 1982) (applying Title VII standards to the ADEA).  An employee's subjective view of materiality is not controlling.  *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1239 (11th Cir. 2001) (emphasis in original), *overruling recognized on other grounds in Minnifield v. City of Birmingham Dep't of Police*, 791 Fed. App'x 86 (11th Cir. 2019).

Campbell testified in his deposition that the travel request denials affected him only by preventing him from doing "the best job [he] could do in supporting those projects," and that nobody complained about his job performance as a result of not traveling.  Doc. 21 at 72:2–11.  This is not enough to constitute a materially adverse employment action.  Accordingly, the travel request denials were not an adverse employment action.

### b.  Younger, Similarly Situated Employees

Campbell contends that Hodges and Griner were younger and similarly situated individuals because they were also program managers.  His contention that Hodges was in a similar position is meritless because Hodges was not employed by ACC.  Docs. 21 at 35:6−13.  Additionally, Campbell has provided no evidence—other than his conclusory affidavit contradicting his deposition testimony—that Griner's and Hodges' travel requests were never denied.  *Id.* at 35:17−36:2, 39:12−16; Docs. 19-4 ¶ 11; 24-3 at 2.  He has thus failed to provide evidence of a younger comparator being treated more favorably than him.

With regard to the letter of warning, Griner's response to Prenot-Guinard was not similar to Campbell's.  As previously discussed, Campbell upset Jones, an employee of ACC's prime customer, by using what Jones perceived as "discredit[ing]" language.  Jones did not have concerns over the language that Griner used in her email, which is why a letter of warning was never issued to her.  The letter of warning was issued to address Jones' concerns over the language Campbell used in the email—language significantly different from the language Griner used.  Accordingly, Campbell cannot identify a similarly situated employee based on the letter.

As for his termination, Campbell, notably, does not allege that he was replaced by someone younger than him or that a similarly situated, younger employee who engaged in the same conduct that he was terminated for was treated more favorably.  *See generally* Docs. 1; 24.  Even if Campbell had made either of those allegations and provided evidence of such, ACC has proffered a legitimate, nondiscriminatory reason for the termination.  As stated in his termination letter, Campbell was fired primarily due

to his December 11 email to Cannane after explicitly being instructed in his October 31 letter of warning to direct any workplace concerns to ACC first and to allow ACC to contact the customer.  Doc. 21 at 298.  Campbell did just the opposite, and as a result, ACC terminated him.

### 2.  Hostile Work Environment Claim

ACC also moves for summary judgment on any possible hostile work environment claim.  Doc. 19.  "To prove a prima facie case of hostile work environment, a plaintiff must establish that: (1) he or she belonged to a protected group, (2) he or she was subjected to unwelcome harassment, (3) the harassment was based on a protected characteristic, (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of his or her employment and create an abusive working environment, and (5) a basis exists for holding the employer liable."  *Trask v. Sec'y, Dep't of Veterans Affairs*, 822 F.3d 1179, 1195 (11th Cir. 2016); *see*, *e.g.*, *Anderson*, 675 F.2d at 1224−25.  Harassment has an objective and a subjective component:  The alleged harassment must, objectively, result in an environment "that a reasonable person would find hostile or abusive" and that the victim "subjectively perceive[s] … to be abusive."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21−22 (1993).  Because, as previously discussed, Campbell cannot even show that he had a good faith and objectively reasonable belief that he was being discriminated against, he cannot possibly show that he was subjected to harassment "that a reasonable person would find hostile or abusive."

## IV.  CONCLUSION

For the foregoing reasons, ACC's motion for summary judgment (Doc. 19) is

**GRANTED**.  Accordingly, Campbell's claims (Doc. 1) are **DISMISSED with prejudice**.

**SO ORDERED**, this 10th day of September, 2020.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT